# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:15-CV-00085-GCM

| JOHN T. MILLER, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | **ORDER** |
| DRIVEN BRANDS SHARED SERVICES, LLC, | ) | |
| Defendants. | ) | |

This matter is before the Court upon the Plaintiff's Motion to Remand. (Doc. No. 7). For the reasons stated herein, the Court remands this matter to Mecklenburg County Superior Court.

## I.  FACTUAL BACKGROUND

Defendant Driven Brands Shared Services, LLC, ("DBSS") is a privately held limited liability corporation that owns and operates well-known automotive service companies, including Maaco, Meineke, Econo-Lube and others. A private equity company, Harvest Partners, purchased DBSS in late 2011 with the goal of reselling the company at a profit in three to five years. Harvest Partners hired a new CEO and charged him with remaking the company to be attractive to potential buyers. One of the CEO's first moves was to hire new management, and provide them with equity interests in the company designed to align their interests with Harvest Partners' goal of reselling the company. Plaintiff John T. Miller ("Miller"), was one of these hires.

DBSS hired Miller in December 2012 to serve as the Senior Vice President for Franchise Sales for the Maaco division of the company. DBSS extended its employment offer to Miller via an emailed letter (hereinafter the "Agreement"), which was signed and accepted by Miller. (Doc. No. 9-1). The Agreement outlined all of Miller's employment terms with the company, and included provisions entitled "Termination" and "Incentive Equity." *Id*.

The "Termination" provision of the Agreement provided most of the terms related to the potential termination of Miller's employment. It established that Miller was an "at will" employee, and addressed the various ways in which Miller's employment could end. *Id*. The provision then defined what the post-employment rights and obligations of both parties would be depending on the manner in which Miller's employment ended. *Id*.

If Miller's employment was terminated without "Cause," he would receive severance payments in an amount equal to 12 months of his base salary, paid in equal monthly installments during the twelve months following termination. *Id*. The Agreement specifically stated that this severance payment would be "in lieu of any other severance payment due to you under Company policies or procedures." *Id*. Miller's on-going eligibility for these severance payments would be contingent on him abiding by the covenant against competition and non-solicitation provisions of the Agreement.

If the company terminated Miller's employment for "Cause" Miller would not be entitled to any severance payment. The Agreement defined "Cause" as:

> (i) being convicted of, or pleading guilty or nolo contendere to, a felony, a crime of moral turpitude or any crime involving the Company, (ii) engaging in (A) willful misconduct, (B) willful neglect of a duty having a material detrimental impact on the Company, (C) fraud, embezzlement or similar actions, (D) misappropriation of the property of the Company or (E) repeated substantial failure in the performance of your duties as an employee of the Company, or (iii) breach in any material respect of this Letter Agreement and/or the duties, obligations, terms and conditions of

your employment by the Company . . . and failure to cure and such above
breach within thirty (30) days following your receipt of written notice
from the Company specifying such breach.

*Id*.

In addition to the severance benefits, the "Incentive Equity" provision of the Agreement granted Miller the rights to equity interests in DBSS, subject to certain defined vesting conditions. This provision stated:

Incentive Equity:

"You shall receive, in consideration of future services to be rendered to Driven Holdings, LLC ("Driven Holdings") and its subsidiaries, you will be issued incentive units that, subject to the vesting and other terms and conditions set forth in your Annex A to that certain Limited Liability Company Agreement of the Company, represent 0.2% of the total equity in Driven Brands at the date of issuance. All of the terms of such incentive equity shall be governed by the terms and conditions of the Agreement ("the LLC Agreement"), including "Annex A- Travis Miller" to the LLC Agreement setting forth such incentive equity."

*Id.*

Annex A evenly grouped the units of equity in to six different tiers of 1,132 common units, with the vesting of each tier being subject to different terms and conditions. (Doc. No. 8-1). Five of the six tiers of equity vested solely upon sale of DBSS, with the vesting of each tier being contingent on different levels of profitability achieved by Harvest Partners when the sale takes place. *Id.* The other tier of equity units vested at 20% per year over a total of five years, but also was to vest immediately if DBSS was sold within those five years. *Id.*

If Miller's employment ended, all unvested equity units were to be forfeited unless two conditions were met: 1) the sale of the business takes place within six months of Miller's employment ending; and 2) Miller's employment ended because he was terminated without "Cause." If Miller was terminated for "Cause" the company also acquired the right to "repurchase" any equity that had already vested for a price of zero dollars. In accordance with

3

the Agreement, DBSS issued Miller 6,792 Executive Units on the date he commenced employment.

Miller's employment with DBSS was terminated by a letter delivered to him on December 10, 2014, in which Noah Pollack, the General Counsel for DBSS, asserts that Miller's termination was for "Cause" due to Miller's "willful neglect of duty having a material detrimental impact on the Company and/or your repeated substantial failure in the performance of your duties as an employee of the Company." (Doc. No. 9-4). As DBSS classified Miller's termination as for "Cause," it claimed he was not entitled to severance and had lost his equity interests in the company. Miller, primarily asserting that the DBSS classification of his termination as for "Cause" was fraudulent, filed a lawsuit against DBSS in state court asserting claims for: 1) breach of contract; 2) violations of North Carolina's Wage and Hour Act; 3) unfair and deceptive trade practices; 4) wrongful discharge; and 5) conversion. Miller seeks compensation for the equity interests and severance benefits he was promised in the Agreement. DBSS timely removed the case to this court claiming that both the severance and equity offers are "employee welfare benefit plans" under 29 U.S.C. § 1002(1) and that Miller's claims are entirely preempted by the Employee Retirement Income Security Act ("ERISA"). Miller subsequently filed the present Motion to Remand.

## II. DISCUSSION

The Court notes at the outset that removal jurisdiction is strictly construed and when federal jurisdiction is in doubt remand is appropriate. *General Technology Applications, Inc. v. Extro Ltda.,* 388 F.3d 114, 118 (4th Cir. 2004). The burden is upon the party opposing remand to establish such facts as will prove jurisdiction and the facts are to be stated in the light most

favorable to the party seeking remand. *Mullaly v. Insurance Services Office, Inc.,* 395 F. Supp.2d 290 (M.D.N.C. 2005).

Defendant's sole ground of establishing federal subject matter jurisdiction is its argument that Plaintiff's claims are completely preempted by ERISA. ERISA's preemption provision states, "[T]he provisions of this subchapter… shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan…" 29 U.S.C. § 1144(a). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96-97 (1983). ERISA provides the exclusive cause of action for the recovery of benefits governed by an ERISA employee benefit plan. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62-63 (1987).

The term "employee benefit plan" can refer to: 1) an "employee welfare benefit plan" (hereinafter "welfare plan"); 2) an "employee pension benefit plan" (hereinafter "pension plan"); or 3) a plan that is both. 29 U.S.C. § 1002(3). Defendant has specifically asserted that the severance and equity incentive provisions of the Agreement at issue herein are part of a welfare plan. A welfare plan is defined in 29 U.S.C. §1002(1) as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).[1]

29 U.S.C. § 1002(1).

---

[1] This section has been construed to include severance benefits. *See Holland v. Burlington Indus., Inc*., 772 F.2d 1140, 1145 (4th Cir. 1985), *abrogated on other grounds*, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

In order for the provisions of the Agreement at issue to be considered part of an ERISA governed welfare plan the employee "benefits" promised by those provisions must be benefits that Congress intended to govern with ERISA. *See J.P. Murphy v. Inexco Oil Co.* 611 F.2d 570, 574 (5th Cir. 1980) ("Congress did not [through ERISA], however, attempt to control every aspect of the employer-employee relationship or every promise made to employees."). Whether a plan exists within the meaning of ERISA is a "question of fact, to be answered in light of all of the surrounding facts and circumstances from the point of view of a reasonable person." *Deibler v. United Food & Commercial Workers' Local Union 23,* 973 F.2d 206, 209 (3d Cir.1992), quoting *Wickman v. Northwestern Nat. Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir. 1990).

### A. The Incentive Equity Provision:

Profit sharing, stock option and sales incentive plans are not expressly included as "welfare benefit plans" in the ERISA statutes or the related regulations (found at 29 C.F.R. § 2510.3–1(a)(3)). In *Murphy,* the Fifth Circuit emphasized the purpose behind the existence of the disputed arrangement when assessing whether an agreement establishes employee benefits covered by ERISA. 611 F.2d at 574. The defendant employer in *Murphy* rewarded an executive employee a "bonus" by assigning a royalty interest in an oil drilling project to a third party to administer for the benefit of the employee. *Id.* at 572. The employee was given "Participation Units," i.e. the rights to receive a portion of any proceeds that might accrue from the oil drilling project. These proceeds were disbursed annually. If the employee left the company for any reason other than death, disability, or retirement he was to be divested of this interest.

The *Murphy* court held that this arrangement was not an ERISA plan after finding it was neither a welfare plan nor pension plan as defined in 29 U.S.C. § 1002. Specifically, the court held the plan was not a welfare plan because, "[t]he statute does not embrace all plans that may

6

incidentally result in the payment of benefits after death or disability but only plans established for the **purpose** of providing those benefits [the ones enumerated in the statue]." *Id.* at 574 (emphasis added). Any "incidental" effects resulting from the plan's implementation were ignored in their assessment of whether the agreement was an ERISA governed welfare plan. *Id*.

Since *Murphy*, courts have consistently held that profit sharing/stock option/profit incentive plans involve current compensation, and are not "welfare benefit plans" under 29 U.S.C. § 1002(1). For example, the Third Circuit held in *Oatway v. American International Group, Inc.,* 325 F.3d 184 (3rd Cir.2003), that the defendant employer's issuance of stock options to certain key employees as a work incentive was not a plan covered by ERISA. At issue in *Oatway* were two "Incentive Stock Option" Agreements. Relying extensively on *Murphy*, the Third Circuit held the stock option plan was not a welfare plan because it was "not designed specifically to provide employees with" the benefits listed in § 1002(1). *Oatway,* 325 F.3d at 188–89. Moreover, the stock option plan was not a pension plan because it was created "to operate as an incentive and bonus program, and not as a means to defer compensation or provide retirement benefits." *Id*. at 188. The plan was "an incentive plan designed to provide a financial incentive for employees to remain with [defendant employer] and improve their performance there." *Id.* at 189. *See also*, *Inman v. Klockner-Pentaplast of Am., Inc*., 467 F. Supp. 2d 642, 652 (W.D. Va. 2006) ( stock option plan offered to certain managers as incentive to increase company's value in order to sell it in four to five years not a welfare plan or pension plan covered by ERISA); *Hahn v. Nat'l Bank, N.A.*, 99 F. Supp. 2d 275, 277 (E.D.N.Y. 2000) ("phantom" stock awards plan designed to "provide key employees with financial incentives for improving the long-term performance" of the defendant company found not to be an ERISA pension benefit plan); *Goodrich v. CML Fiberoptics, Inc*., 990 F. Supp. 48, 50 (D. Mass. 1998)

7

(stock option plan not a welfare benefit plan or pension plan under ERISA); *Kaelin v. Tenneco, Inc.*, 28 F. Supp. 2d 478, 486 (N.D. Ill. 1998) (same, "top hat" plan); *Hagel v. United Land Co.*, 759 F. Supp. 1199, 1204 (E.D. Va. 1991) (same, "override" bonus plan); *Foltz v. U.S. News & World Report, Inc.*, 627 F. Supp. 1143, 1164–65 (D. D.C. 1986) (same, stock bonus plan).

Defendant argues that the Incentive Equity benefit is merely a severance benefit[2] that is covered by ERISA because it is designed to provide compensation upon termination of employment. Five out of the six classes vest solely upon the sale of DBSS by Harvest Partners. Even the class of equity that vested in 20% increments was to vest completely should the sale of DBSS occur.

However, it does not appear to the Court that the Incentive Equity benefit was "established… for the purpose of providing" severance benefits, but rather for the purpose of incentivizing sales. Even though five classes of the Equity can vest solely upon the sale of DBSS, the vesting of those classes is also contingent on different levels of profit being realized by Harvest Partners when the sale takes place. This aligned Plaintiff's interests with Harvest Partners' goal of making the sale of DBSS as profitable as possible. The purpose of the Incentive Equity benefit therefore appears to be to function as a sales incentive plan or a bonus plan. Even the provision of the Agreement establishing the Plaintiff's rights to the Equity is entitled "Incentive Equity." In fact, the title of all six classes of Equity established by Annex A includes the word "Incentive." As the court must view all the facts in the light most favorable to the party seeking remand, it does not appear that the Equity Incentive can be considered a severance benefit.

---

[2] Defendant does not argue that the Incentive Equity benefit is a pension plan.

### B. Severance Benefits:

While severance can be considered a welfare benefit plan, the fact that the Agreement addresses severance benefits, standing alone, is insufficient to bring it under the coverage of ERISA. *See Lomas v. Red Storm Entertainment, Inc*., 49 Fed. Appx. 396, 399 (4th Cir. 2002). In *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987), the Supreme Court held that ERISA did not preempt a Maine statute that mandated specific severance amounts for employees subjected to a plant closing in that state. In so doing, the Court noted that there is a clear distinction between severance *plans* and severance *benefits* for purposes of ERISA preemption. The Court explained:

> Congress intended preemption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. The concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation. It is for this reason that Congress preempted state law relating to *plans*, rather than simply to *benefits*.

*Fort Halifax*, 482 U.S. at 11-12 (emphasis in original).

The Fourth Circuit has addressed the issue of ERISA preemption with regard to severance agreements in two cases: *Gresham v. Lumbermen's Mutual Casualty Co.*, 404 F. 3d 253 (4th Cir. 2005) and *Lomas v. Red Storm Entm't, Inc.*, 49 F. App'x 396 (4th Cir. 2002). In *Gresham*, the Fourth Circuit found that a severance agreement that provided a benefit separate and distinct from the company's regular severance plan was a "benefit" rather than a "plan" and thus was not covered by ERISA. The *Gresham* plaintiff was hired as a vice president for the professional liability division of Kemper Insurance. Like the Agreement herein, his offer letter included a promised severance of one year's salary if terminated without cause. *Gresham*, 404 F.3d at 256. About five years after plaintiff was hired, Kemper decided to discontinue its

professional liability line and soon thereafter gave the plaintiff a 60-day notice of termination. *Id*. at 256-57. Under the company severance plan referred to in the notice letter, plaintiff was entitled to four weeks of severance. *Id*. at 256. Based upon the severance promise in his offer letter, plaintiff sued for the one-year severance under theories of breach of contract and a violation of Maryland's wage and hour statutes. *Id*. at 257. The district court held that ERISA preempted those state law claims and granted summary judgment to the company. *Id*. The Fourth Circuit reversed, finding the severance agreement was not an ERISA plan because of:

> the substantial differences between the severance provision of Gresham's employment agreement and the terms of the Severance Plan-most notably the significantly greater amount of the benefit promised to Gresham and the absence of any conditions other than termination without cause-make clear that Kemper's promise to pay Gresham severance operated independently of the Severance Plan.

*Id*. at 259.

In the earlier case of *Lomas*, the Fourth Circuit reversed the district court's grant of summary judgment in favor of the employer. The district court had determined that a severance agreement was covered by ERISA. In remanding the case, the Fourth Circuit observed that:

> the Agreement, executed after [the Company's Retention and Severance Program or "RSP"] was created, specifically supersedes all prior agreements and understandings between Lomas and Red Storm on the issue of severance benefits. Agreement at ¶ 4. This provision could well signify that the Agreement supersedes the RSP. *Supporting this contention, the Agreement provides that Lomas's entitlement to benefits thereunder would foreclose his right to receive benefits under any other severance plan.*

*Id*. at 401 (emphasis added).

Moreover, the First Circuit offered this assessment of the application of *Ft. Halifax* to a simple severance agreement of a specific cash payment like the one at issue here:

> ERISA's substantive protections are intended to safeguard the financial integrity of employee benefit funds, to permit employee monitoring of

earmarked assets, and to ensure that employers' promises are kept. *Since a single-shot benefit requires no greater assurance than that the check will not bounce, ERISA's panoply of protections has virtually nothing to do with such a simple task.* More elaborately structured benefits, however, raise a different set of concerns.

*Belanger v. Wyman-Gordon Co.*, 71 F.3d 451, 454 (1st Cir. 1995) (emphasis added, internal citations omitted).

Under the foregoing authority, the severance agreement at bar does not appear to be covered by ERISA. Defendant expressly made Miller a one-year severance offer "in lieu of" severance available under company policies. Also, the severance offered the Plaintiff was dramatically more generous than the company severance plan described at page 4 of the offer letter.

Under *Ft. Halifax*, courts have looked to whether the severance benefit at issue "requires an ongoing administrative program" to determine whether ERISA applies. *See Fort Halifax*, 482 U.S. at 12. Although the Fourth Circuit has not yet articulated a framework for determining whether a payment of severance benefits requires an ongoing administrative scheme, district courts in this circuit generally analyze four factors when determining whether there is an on-going administrative program:

1) the payments are one-time lump sum payments or continuous payments;

2) the employer undertook any long-term obligation with respect to the payments;

3) the severance payments come due upon the occurrence of a single, unique event in the course of business or on a recurring basis; and

4) the amount of managerial discretion granted in paying the benefits and whether a case-by-case review of employees is needed.

*Rinaldi v. CCX, Inc.*, No. 3:05-CV-108-RJC, 2008 WL 2622971, (W.D.N.C. July 2, 2008); *Jenkins v. Chesapeake Harwood Products, Inc.*, No. 3:07-CV-405, 2007 WL 4568974 (W.D.N.C. Dec. 20, 2007). No one factor is determinative. *Donovan v. Branch Banking & Trust Co.*, 220 F.Supp.2d 560, 565 (S.D.W.Va. 2002).

With regard to the first and second factors, the fact that a specific sum is divided into twelve equal monthly payments does not necessarily create an ongoing administrative scheme, and twelve months is not a "long-term obligation" with respect to the payments. *See Delaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir.1994) ("While payment could continue for as long as two years, there is nothing discretionary about the timing, amount, or form of the payment."); *James v. Fleet/Norstar Fin. Group*, 992 F.2d 463, 466 (2nd Cir.1993) ("The employee's option to receive the money in bi-weekly installments instead of in a lump sum did not change the basic situation."); *Wells v. General Motors Corp.*, 881 F.2d 166, 176 (5th Cir.1989) (Option to choose two- year installment payments did not render program "ongoing, nor was there any need for continuing administration of the payment program."); *Emery v. Bay Capital Corp.*, 354 F. Supp. 2d 589, 594 (D. Md. 2005) ("Simply continuing to pay Plaintiffs salary for six months after his termination, presumably out of Defendant's general fund, does not require the establishment of a separate, ongoing administrative scheme to administer these severance benefits."); *Donovan*, 220 F.Supp.2d at 565 ("[S]imple, mathematical calculations control the amount of the payment and no ongoing administrative scheme is necessary."). Paying Plaintiff the equivalent of his base salary for twelve months does not require any "ongoing administrative scheme" under these cases.

With regard to the third factor, the severance benefits become due upon the occurrence of a single, unique event: the termination of Mr. Miller without cause, and other than because of his

death or disability. This event can presumably only happen once, and not on a recurring basis so as to require any sort of an ongoing administrative program.

The only factor that implicates the finding of an ERISA plan is the last factor. When an employer must determine eligibility for severance benefits based upon whether an employee is terminated for cause or without cause, it requires the exercise of some discretion. *Rinaldi*, 2008 WL 2622971, at *4; *Jenkins*, 2007 WL 4568974, at *2; *Mullaly*, 395 F.Supp.2d at 295; *Blair v. Young Phillips Corp.*, 158 F.Supp.2d 654, 659-60 (M.D.N.C. 2001); *but see Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997); *Belanger*, 71 F.3d at 455 (holding that a "for cause" determination was a "purely mechanical determination of eligibility"); *Emery*, 354 F.Supp. 2d at 596; *Donovan*, 220 F.Supp.2d at 566-67.

Finding that this last factor weights in favor of an ERISA welfare benefit plan, however, does not compel that conclusion. Three of the four factors weigh against the finding of an ongoing administration program. Moreover, as discussed above, the *Gresham* and *Lomas* cases support the conclusion that the severance benefit at issue is not governed by ERISA. Accordingly,

IT IS THEREFORE ORDERED that Plaintiff's Motion to Remand is hereby GRANTED and this matter is remanded to Mecklenburg County Superior Court.

Signed: August 20, 2015

Graham C. Mullen
United States District Judge